**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

GEORGE & COMPANY, LLC,

*Plaintiff-Appellant,*

v.

IMAGINATION ENTERTAINMENT
LIMITED; IMAGINATION HOLDINGS
PTY LTD.; IMAGINATION DVD,
INCORPORATED,

No. 08-1921

*Defendants-Appellees,*

and

JOHN DOE(S) 1-10,

*Defendant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Leonie M. Brinkema, District Judge.
(1:07-cv-00498-LMB-TRJ)

Argued: May 12, 2009

Decided: July 27, 2009

Before WILKINSON and KING, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

───────────────

Affirmed by published opinion. Senior Judge Hamilton wrote
the opinion, in which Judge Wilkinson and Judge King
joined.

**COUNSEL**

**ARGUED:** Mark S. Sommers, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C., for Appellant. William Francis Krebs, BEAN, KINNEY & KORMAN, PC, Arlington, Virginia, for Appellees. **ON BRIEF:** Douglas A. Rettew, Naresh Kilaru, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C., for Appellant. Christopher A. Glaser, Heidi E. Meinzer, BEAN, KINNEY & KORMAN, PC, Arlington, Virginia, for Appellees.

**OPINION**

HAMILTON, Senior Circuit Judge:

On May 21, 2007, George and Company, LLC (George) brought this trademark infringement action against Imagination Entertainment Limited, Imagination Holdings PTY Limited, and Imagination DVD, Incorporated (collectively Imagination), claiming that Imagination infringed upon George's trademark rights in "LCR" and "LEFT CENTER RIGHT." The district court granted summary judgment in favor of Imagination. George appeals, and we now affirm.

I

A

George is a limited liability New York corporation with its principal place of business in Naples, Florida. It has marketed and sold dice games, party games, board games, and related entertainment products for more than a century.

Imagination is an Australian corporation with its headquarters in Kent Town, Australia. It markets and sells dice games,

board games, and related gaming products in several countries, including the United States.

Each of the parties markets and sells a generic dice game (the Dice Game). Game play for the Dice Game is simple and straightforward. At least three players are required, and each player starts with three chips. The players then take turns rolling three specially-marked dice. Each side of the dice is marked with one of the following: the letter "L," the letter "R," the letter "C," or a dot symbol. The number of L's on the roll indicates the number of chips to be passed to the player to the left of the roller, the number of R's indicates the number of chips to be passed to the player to the right of the roller, and the number of C's indicates the number of chips to be placed in the center pot. Dots are neutral and do not require the roller to pass his chips or place them in the center pot. When a player has two or less chips in his possession, he rolls the number of dice equivalent to the number of chips he possesses; for example, a player with two chips rolls two dice. A player with no chips still plays, but on his turn he has to pass the dice to the next player and hope that the rollers adjacent to him, after their roll, pass him some chips. As the game progresses, players gain and lose chips, while the number of chips in the center pot increases. The Dice Game ends when only one player has chips remaining, and that player is declared the winner and is awarded the chips in the center pot.[1]

B

According to George, beginning some time in 1983, it began to market and sell versions of the Dice Game under the

[1]Understandably, neither party in this case claims that it has rights in the Dice Game itself. The Dice Game, in one form or another, has existed for many years under a variety of names. Moreover, two individuals unrelated to this case filed a patent for a game ("Left, Center, Pot") almost identical to the Dice Game, which was approved by the United States Patent and Trademark Office (USPTO) on July 7, 1987. The patent expired on October 4, 2005 and was never challenged during its pendency.

names "LCR" and "LEFT CENTER RIGHT." From 1983 to 1991, the game was sold in foil wrap, with either LCR or LEFT CENTER RIGHT hand- written on the foil.[2]

Beginning in 1992, George began to market and sell its version of the Dice Game exclusively under the LCR name. The parties agree that George intended LCR to be an abbreviation of LEFT CENTER RIGHT. George owns registered trademarks for LCR and a related rolling-dice design (the Rolling Dice Design).[3] George never sought to register the mark LEFT CENTER RIGHT.

At the time George initiated this trademark infringement action, it sold its LCR game in two forms, either in cardboard-backed blister packaging or in a plastic tube hanging from a rack.[4] The cardboard-backed blister packaging and the cardboard on the display rack are similar in all material respects.[5] They are predominately white in color, and contain a ™ designation following the Rolling Dice Design and a notice that "LCR ™ is a Trademark of George & Co."

Several features of the cardboard-backed blister packaging are worthy of note. First, the packaging prominently displays the name of the Dice Game through the Rolling Dice Design. The Rolling Dice Design depicts the faces of three dice in horizontal succession, with the face of the first dice containing an "L," the second a "C," and the third an "R." In the

---

[2]We accept, for purposes of summary judgment, that George marketed and sold a version of the Dice Game under the name LEFT CENTER RIGHT between 1983 and 1991. We note, however, that the evidence supporting this fact comes only from an affidavit of George's president, Peter Smilanich. The record contains no physical evidence to support Smilanich's averment, *e.g.*, product pictures, packaging designs, etc.

[3]An illustration of the Rolling Dice Design is set forth in Appendix A to this opinion.

[4]George began offering LCR in these forms of packaging in 1992.

[5]An illustration of the LCR cardboard-backed blister packaging is set forth in Appendix B to this opinion.

design, the three dice almost touch each other, with the L dice tilted to the left, the C dice tilted to the right, and the R dice tilted to the left. A ™ symbol is located in the lower right-hand corner of the design.

Second, the packaging uses the following tagline, "Left, Center or Right – Don't Lose Your Chips" (the Tagline). Third, the packaging contains a design (the Arrows Design) in which the faces of the three dice that appear in the Rolling Dice Design are arranged in a U-shaped design, with the L dice on the upper left side of the U-shaped design, the C dice on the bottom of the U-shaped design, and the R dice on the upper right side of the U-shaped design. The word "Left" is located to the left of the face of the L dice, the word "Center" is located below the face of the C dice, and the word "Right" is located to the right of the R dice. The Arrows Design also has three chips, one below the face of the L dice, one above the face of the C dice, and one below and slightly to the right of the face of the R dice. Three arrows also appear, one running around the left side of the chip below the face of the L dice, one pointing from the face of the C dice to the chip appearing above it, and one running around the right side of the chip below the face of the R dice.

Fourth, a much smaller version of the Rolling Dice Design appears in other places on the packaging, and each time a ™ symbol follows the design. The design is used to inform the customer that LCR is "the new game that everyone's getting hooked on. So simple, kids love it." It is also used to inform the customer that the game is so "contagious and fast-paced" that parents "grab up" LCR "for themselves." Customers are told through use of the design that you play LCR "with chips or whatever makes it fun for you." Finally, the design is used to inform the customer that LCR "is a game for 3 or more players ages 5 to 105!"

After the initiation of this trademark infringement action, George added a new package design, which is predominately

blue in color, to its arsenal of LCR products.[6] In addition to an ® designation following the Rolling Dice Design, the new product contains ™ designations next to the Tagline and the Arrows Design.

George markets and sells its LCR games online and in retail shops, including its own retail shop in Williamsville, New York. In the four years leading up to the filing of this infringement action, George sold an average of more than 500,000 LCR games per year.

C

In 2006, Imagination began marketing its version of the Dice Game to potential distributors under the name "LeFT CeNTeR RIGHT."[7] In June 2007, Imagination began distributing and selling LEFT CENTER RIGHT to the consuming public. The rules and game play for LEFT CENTER RIGHT are the same in all material respects to the rules and game play of LCR. On January 30, 2006, Imagination filed an application with the USPTO for the purpose of registering LEFT CENTER RIGHT as a trademark on the Principal Register. On July 17, 2006, the application was denied on the ground that the mark LEFT CENTER RIGHT was descriptive. On January 17, Imagination filed an amended application, which on March 5, 2007 was denied, once again on descriptiveness grounds. On September 7, 2007, Imagination amended its application once more, this time seeking registration on the Supplemental Register.[8] On October 1, 2007, the

---

[6]An illustration of the predominately blue packaging used by George is set forth in Appendix C to this opinion.

[7]Although Imagination's version of the Dice Game is titled "LeFT CeNTeR RIGHT," for reading convenience we will refer to the title as LEFT CENTER RIGHT.

[8]A descriptive term lacking secondary meaning may not appear on the Principal Register, but may appear on the Supplemental Register. *E.T. Browne Drug Co. v. Cococare Prods., Inc.*, 538 F.3d 185, 202 (3d Cir.

USPTO accepted Imagination's amendment and placed LEFT CENTER RIGHT on the Supplemental Register.

Imagination sells LEFT CENTER RIGHT in two versions, a "card pack" version and a plastic-wrapped "tin" version.[9] Both the card pack and tin version are bright red with bent yellow arrows depicting game movement with the game name, LEFT CENTER RIGHT, displayed in the center of each package. The tagline "The Addictive Dice Game" is featured prominently on the "card pack" version on the bottom right inside a dice and prominently on the "tin" version on the bottom center.

Imagination places its name and logo in an upper corner of each version. Imagination's packaging displays a ™ designation next to LEFT CENTER RIGHT and contains the notice "IMAGINATION ™ NAME AND LOGO AND LEFT CENTER RIGHT ™ ARE TRADEMARKS OF IMAGINATION ENTERTAINMENT LIMITED AND IMAGINATION HOLDINGS PTY LTD."

D

On May 21, 2007, George filed this trademark infringement action seeking declaratory, injunctive, and monetary relief under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and Virginia law. The gist of George's complaint is that Imagination's use

---

2008). Unlike registrations on the Principal Register, registrations on the Supplemental Register do not receive some of the advantages extended to marks registered on the Principal Register. 15 U.S.C. § 1094. In particular, unlike principal registration, supplemental registration is not *prima facie* evidence of the validity of the registered mark, of ownership of the mark, or of the registrant's exclusive right to use the registered mark in commerce. *Id.* § 1057(b).

[9]An illustration of Imagination's card pack version of LEFT CENTER RIGHT is set forth in Appendix D to this opinion; an illustration of the tin version is set forth in Appendix E.

of LEFT CENTER RIGHT infringes on: (1) George's federal trademark rights in LEFT CENTER RIGHT; and (2) George's LCR trademark, which is federally-registered. In resolving these claims, the district court granted Imagination's motion for summary judgment, reasoning that George had no federal trademark rights in LEFT CENTER RIGHT and that there was no likelihood of confusion created by Imagination's use of LEFT CENTER RIGHT. George noted a timely appeal.

## II

We review an award of summary judgment *de novo*. *Hawkspere Shipping Co., Ltd. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We construe the evidence in the light most favorable to George, the party opposing Imagination's summary judgment motion, and draw all reasonable inferences in its favor. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (*en banc*).

## A

George first alleges that Imagination's use of LEFT CENTER RIGHT infringed upon its federal trademark rights in LCR.

A trademark includes any word, name, symbol, or device used by an individual to identify and distinguish his goods "from those manufactured or sold by others and . . . [to] indicate the source of the goods." 15 U.S.C. § 1127. A trademark puts the purchasing public on notice that all goods bearing the trademark: (1) originated from the same source; and (2) are of equal quality. *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 538 (4th Cir. 2004). Thus, a trademark not only "protects

the goodwill represented by particular marks," but also allows "consumers readily to recognize products and their source," preventing "consumer confusion between products and between sources of products." *OBX-Stock, Inc. v. Bicast, Inc.*, 558 F.3d 334, 339 (4th Cir. 2009).

To establish trademark infringement, a plaintiff must prove that it owns a valid and protectable mark, and that the defendant's use of a "reproduction, counterfeit, copy, or colorable imitation" of that mark creates a likelihood of confusion. 15 U.S.C. § 1114(1)(a); *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir. 2006); *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 91 (4th Cir. 1997). The parties do not dispute that George possesses a valid and protectable mark in LCR.[10] The only question is whether Imagination's use of LEFT CENTER RIGHT creates a likelihood of confusion with George's use of LCR.

A likelihood of confusion exists if "the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *CareFirst*, 434 F.3d at 267 (citation and internal quotation marks omitted). In assessing whether such confusion exists, "we look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.*

Our likelihood of confusion case law instructs us to examine nine factors: (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of

---

[10]Because the parties do not dispute the validity and protectability of LCR, the issues of validity and protectability are irrelevant in this appeal. *Petro Stopping*, 130 F.3d at 91 n.2. Whether the district court properly characterized LCR as suggestive with respect to the first likelihood of confusion factor—strength of the mark—is a different issue that will be considered *infra*. *Id.*

the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984) (setting forth factors one through seven); *see also Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996) (identifying factors eight and nine). Not all of these factors are of equal importance, "nor are they always relevant in any given case." *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir. 1992); *see also id.* (noting that the *Pizzeria Uno* factors are not meant to be a rigid formula for infringement; they are "only a guide—catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion"). However, evidence of actual confusion is "often paramount" in the likelihood of confusion analysis. *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001); *see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 937 (4th Cir. 1995) (noting that the actual confusion factor is "entitled to substantial weight as it provides the most compelling evidence of likelihood of confusion").

The first likelihood of confusion factor focuses on the strength of the mark. Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark. Strength consists of both conceptual strength and commercial strength. *CareFirst*, 434 F.3d at 269.

A mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Pizzeria Uno*, 747 F.2d at 1527. A generic mark describes a product in its entirety, *Sara Lee*, 81 F.3d at 464 n.10, and, therefore, "neither signifies the source of goods nor

distinguishes the particular product from other products on the market." *Retail Servs.*, 364 F.3d at 538. Unlike distinctive marks, a generic mark is never entitled to trademark protection. *See id.* (referring to a generic mark as the "antithesis of a distinctive mark"). Examples of generic marks are bleach, copiers, cigarettes, and cars.

Fanciful marks, which are inherently distinctive, typically involve made-up words created for the sole purpose of serving as a trademark. *See Sara Lee*, 81 F.3d at 464 (noting that Clorox®, Kodak®, Polaroid®, and Exxon® are fanciful marks). Arbitrary marks, which are also inherently distinctive, typically involve common words that have no connection with the actual product, as "they do not suggest or describe any quality, ingredient, or characteristic," so the mark can be viewed as "arbitrarily assigned." *Id.*; *see also id.* (noting that "Camel® cigarettes" and "Apple® computers" are arbitrary marks).

Suggestive marks, which are also inherently distinctive, do not describe a product's features but merely suggests them. *Retail Servs.*, 364 F.3d at 538. In other words, the exercise of some imagination is required to associate a suggestive mark with the product. *Id.* Examples of suggestive marks are "Coppertone®, Orange Crush®, and Playboy®." *Sara Lee*, 81 F.3d at 464.

Descriptive marks define a particular characteristic of the product in a way that does not require any exercise of the imagination. *Retail Servs.*, 364 F.3d at 538. Examples of descriptive marks include "After Tan post-tanning lotion" and "5 Minute glue." *Sara Lee*, 81 F.3d at 464. Descriptive marks are not inherently distinctive; rather, they require a showing of secondary meaning before they receive trademark protection. *Retail Servs.*, 364 F.3d at 538; *see also* 15 U.S.C. § 1052(e)(1) (noting that registration may be refused if the proposed mark, "when used on or in connection with the goods of the applicant is merely descriptive or deceptively

misdescriptive of them"). "Saying that a trademark has acquired secondary meaning is shorthand for saying that a descriptive mark has become sufficiently distinctive to establish a mental association in buyers' minds between the alleged mark and a single source of the product." *Retail Servs.*, 364 F.3d at 539 (citation and internal quotation marks omitted); *see also Sara Lee*, 81 F.3d at 464 (noting that "secondary meaning" exists when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself" (internal quotation marks omitted)); *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990) ("Secondary meaning is the consuming public's understanding that the mark, when used in context, refers, not to what the descriptive word ordinarily describes, but to the particular business that the mark is meant to identify.").

Distinguishing between a suggestive mark and descriptive mark can be difficult. However, "'if the mark imparts information directly, it is descriptive,'" but "'[i]f it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.'" *Pizzeria Uno*, 747 F.2d at 1528 (quoting *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 379 (7th Cir. 1976)). "An abbreviation of a descriptive term which still conveys to the buyer the descriptive connotation of the original term will still be held to be descriptive." 2 Thomas McCarthy, *McCarthy On Trademarks and Unfair Competition* (hereinafter *McCarthy*) § 11:32 (collecting cases); *see also id.* § 7:11 ("If a series of letters is merely a recognizable abbreviation for a descriptive or generic term, the abbreviation is also classified as descriptive or generic.").[11]

---

[11]Of course, an abbreviation or nickname of a descriptive term may be protectable upon the showing of secondary meaning. *Cf. G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 994-99 (7th Cir. 1989) (holding that "L.A." was a descriptive abbreviation for the descriptive words "low alcohol" for beer and no secondary meaning was

The district court concluded that the LCR mark was suggestive, understandably because Imagination conceded the mark was suggestive. Under these circumstances, like the district court, we are constrained to conclude that the LCR mark is suggestive. We are obligated to defer to the determination of the USPTO, which constitutes *prima facie* evidence of whether a mark is descriptive or suggestive. *Lone Star Steakhouse*, 43 F.3d at 934. If the USPTO believes a mark is descriptive, the registrant must provide evidence of secondary meaning before the USPTO will grant registration. *Id.* Here, the parties agree that the LCR mark was registered by the USPTO without any proof of secondary meaning, and that the USPTO determined that the LCR mark was suggestive. And although Imagination had an opportunity in the district court to rebut the presumption raised by the USPTO's determination, it declined to do so, instead conceding that the LCR mark is suggestive. Accordingly, even though LCR is an abbreviation for LEFT CENTER RIGHT and we harbor doubt that the LCR mark is suggestive,[12] we are not at liberty to take issue with the district court's determination.

Our strength of the mark analysis does not end here. The placement of a mark in either the descriptive or suggestive category simply is the first step. The second step considers the mark's commercial strength, a concept similar to the "second-

---

acquired); *see also Metropolitan Opera Ass'n v. Metropolitan Opera Ass'n of Chicago*, 81 F. Supp. 127, 129 (D.Ill. 1948) (noting that "MET," short for the descriptive term "METROPOLITAN OPERA" has acquired secondary meaning); *McCarthy* § 12:37 ("In some instances, computer and Internet abbreviations may be classified as descriptive terms, which could become trademarks on the acquisition of secondary meaning.").

[12]After all, LCR is an abbreviation of the descriptive term LEFT CENTER RIGHT. LEFT CENTER RIGHT is a descriptive term because it describes a generic dice game that has been in the public domain for quite some time where players move chips to the left, the center, or the right based on the outcome of the roll. Moreover, the USPTO has repeatedly found LEFT CENTER RIGHT descriptive.

ary meaning" inquiry considered in evaluating a mark's validity. *CareFirst*, 434 F.3d at 269 n.3. Proof of secondary meaning entails a rigorous evidentiary standard. *Perini*, 915 F.3d at 125. In *Perini*, we set forth six factors for a court to consider in assessing the acquisition of secondary meaning. *Id.* They are: (1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark. *Id.*

With regard to the first *Perini* factor, George's advertising expenditures were minimal. With regard to the second factor, no consumer studies were performed linking the LCR mark to George. The absence of such evidence is telling, as such evidence is "generally thought to be the most direct and persuasive way of establishing secondary meaning." *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 526 n.13 (4th Cir. 2002). With regard to the remaining factors, the record discloses that George: (1) enjoyed some unsolicited media attention; (2) was not aware of any attempts to plagiarize prior to Imagination's activities; (3) used the LCR mark for over twenty years; and (4) enjoyed recent sales success.

In assessing these factors under the summary judgment standard, it is evident that LCR has not acquired secondary meaning in the context of our commercial strength analysis. Put simply, the record does not disclose that a substantial number of present or prospective customers, when hearing or reading of LCR, would associate LCR specifically with George. *Cf. id.* at 526 (concluding that, notwithstanding evidence of advertising expenditures and sales success, summary judgment was appropriate).

In our view, the LCR mark's lack of commercial strength renders the mark weak for purposes of our strength of the mark analysis. *Cf. Petro Stopping*, 130 F.3d at 93 ("Even a

mark held to be suggestive may be found weak under the first likelihood of confusion factor."). As we noted in *Petro Stopping*, the "strength of a mark ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source." 130 F.3d at 93. Here, the record is devoid of meaningful evidence demonstrating that consumers associate the LCR mark with George.

In assessing the similarity of the marks under the second *Pizzeria Uno* factor, we focus on the dominant portions of the parties' marks. *Lone Star Steakhouse*, 43 F.3d at 936; *Pizzeria Uno*, 747 F.2d at 1534-35. In other words, we focus on whether there exists a similarity in sight, sound, and meaning which would result in confusion. *See Pizzeria Uno*, 747 F.2d at 1534-35 (noting that "Uno," as used by the parties, was similar in "appearance," "sound," and "meaning"); *see also Sara Lee*, 81 F.3d at 465 (noting that the two marks at issue, though not identical, were "perceived similarly by the eye and ear"); *McCarthy* § 23:21 (noting that the degree of similarity between marks is tested on three levels as encountered in the marketplace: sight, sound, and meaning).

The district court found that LCR and LEFT CENTER RIGHT were dissimilar. The district court reasoned that the marks neither looked alike, nor sounded alike. The district court noted that LCR consisted of three capital letters, and LEFT CENTER RIGHT consisted of three words. The district court also noted that, because the parties conceded LCR was suggestive, it did not necessarily follow that consumers in the marketplace would understand LCR and LEFT CENTER RIGHT to be similar in meaning.

The district court's conclusion that the second *Pizzeria Uno* factor weighed against George was correct. The two marks look and sound different. George tries to counter this evidence by arguing that, as an abbreviation of LEFT CENTER RIGHT, LCR means the same thing as LEFT CENTER RIGHT. Assuming *arguendo* that this is the case, the manner

in which the marks are used on their respective packaging distinguishes the two marks beyond doubt. Imagination's packaging and branding is totally different from that of George. George uses a plain white background with the game prominently displayed (encased in clear plastic) near the Rolling Dice Design, the Tagline, and the Arrows Design. George uses mostly the same elements in its newer, blue packaging. In contrast, Imagination's game does not use LCR alone or in a similar design to the Rolling Dice Design, the Tagline, or the Arrows design. The names of both George and Imagination appear on their respective packaging as the source of their respective goods. In short, a consumer in a toy store or online examining the marks side-by-side unquestionably would conclude that the two marks are quite different. *Cf. Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830-31 (8th Cir. 1999) (holding that "Lean Cusine" was dissimilar to "Lean 'N Tasty," reasoning that "[w]ith the exception of the word 'lean,' which is generally descriptive of food and not registerable as a trademark, the two marks look and sound different"); *Petro Stopping*, 130 F.3d at 94 (holding that PETRO STOPPING CENTER and JAMES RIVER PETRO CARD were dissimilar in sight and appearance); *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983) (holding that "Yogowhip" and "Miracle Whip" are dissimilar because they look and sound different and because of the differences in the product labels).

With regard to the third factor, the similarity of the goods or services identified by the marks, we note that the goods in question need not be identical or in direct competition with each other. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001). The district court concluded that the parties' goods were nearly identical and, therefore, the similarity factor weighed in favor of George. We find no error in the district court's examination of the third factor.

The fourth and fifth factors examine the similarity of the facilities used by the parties and the similarity of their adver-

tising. The district court found that these two factors favored George because the parties competed in a similar manner in overlapping markets. We find no error in the district court's treatment of these factors.

The sixth factor to be considered is Imagination's intent in adopting its LEFT CENTER RIGHT mark. In *Pizzeria Uno*, we noted that this factor sometimes is a "major" factor because "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion." 747 F.2d at 1535.

George argues that Imagination intentionally adopted a similar mark to trade on George's goodwill in LCR. George further posits that Imagination exhibited bad faith by failing to conduct a trademark search or to obtain advice of counsel before adopting the LEFT CENTER RIGHT mark for use on its version of the Dice Game. Despite these contentions, George has presented no meaningful evidence that Imagination wished to capitalize on George's LCR trademark. Imagination understandably chose LEFT CENTER RIGHT because it succinctly describes how the generic Dice Game is played. Moreover, George's packaging does not lead one to conclude that it sought trademark rights in LEFT CENTER RIGHT. A ™ symbol only follows the Rolling Dice Design, and language on the packaging notifies a potential competitor that trademark rights are sought only in LCR ("LCR ™ is a Trademark of George & Co."). George's packaging designates exactly what it considers to be a trademark—LCR and the Rolling Dice Design. Thus, Imagination's use of LEFT CENTER RIGHT evidences at most an intent to compete with LCR and not an intent to infringe on George's LCR trademark. Finally, the failure to conduct a trademark search or contact counsel shows carelessness at most, but is in any event irrelevant because knowledge of another's goods is not

the same as an intent "to mislead and to cause consumer confusion." *Luigino's*, 170 F.3d at 831 (citation and internal quotation marks omitted). Accordingly, the district court committed no error in concluding that the intent factor militated against a finding of a likelihood of confusion.

The seventh and most important factor is actual confusion. Actual confusion can be demonstrated by both anecdotal and survey evidence. *Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc.*, 87 F.3d 654, 661 (4th Cir. 1996). Evidence of only a small number of instances of actual confusion may be dismissed as *de minimis*. *Petro Stopping*, 130 F.3d at 95; *see also McCarthy* § 23:14. In assessing the weight of the evidence, we note that

> [e]vidence of the number of instances of actual confusion must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence. If there is a very large volume of contacts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight.

*McCarthy* § 23:14; *see also Petro Stopping*, 130 F.3d at 95 ("In light of [the plaintiff's] huge volume of commerce, [the plaintiff's] meager evidence of actual confusion is at best *de minimis*.").

Before the hearing on Imagination's motion for summary judgment, George's evidence of actual confusion came from two individuals, Corinne Harrison and Melissa Fortunato. Harrison is a toy store owner in Des Moines, Iowa. In January 2007, an Imagination distributor visited Harrison's store and showed her Imagination's 2007 catalog. When Harrison saw Imagination's LEFT CENTER RIGHT game depicted, she

thought the game had been licensed by George because it bore the LEFT CENTER RIGHT name.

In February 2007, Harrison visited Imagination's booth at a New York toy fair. There, she saw LEFT CENTER RIGHT game materials and still believed the game was licensed by George because it bore the name LEFT CENTER RIGHT. Harrison ordered a number of units of Imagination's LEFT CENTER RIGHT game because she still mistakenly thought Imagination's game was licensed by George. According to Harrison, had she known Imagination's game was unlicensed, she would not have placed the order, implying that it was "wrong" for Imagination to take business away from a "small company" like George.

Fortunato, a toy company manager, contacted George in October 2006 seeking to obtain a license to make a deluxe version of George's LCR game. George declined because it was interested in making its own deluxe version. Upon seeing Imagination's 2007 catalog, Fortunato believed that Imagination had obtained a license from George to make a deluxe version of George's LCR game.

After the district court took Imagination's motion for summary judgment under advisement, George twice sought leave to file additional evidence of actual confusion. In both instances, the district court granted the motion, which allowed George to present evidence of actual confusion from two additional individuals, Sharon Lynch and Jill Smilanich.[13]

In November 2007, Lynch, a sales associate at George's retail store in Williamsville, New York, was approached in the store by a customer looking for a game called "LEFT CENTER RIGHT." The customer had previously played

---

[13]In March 2008, George filed yet another motion for leave to file additional evidence, which was granted in the district court's July 2008 memorandum opinion disposing of the case.

LCR, as her friend purchased LCR at George's store. The customer informed Lynch that the Toys R Us (where Imagination's game was sold) was selling a more expensive version of George's game.

In December 2007, Smilanich, George's office manager, received a call from a consumer who had purchased Imagination's game but mistakenly believed it was George's game. According to Smilanich, the caller complained about the game she purchased and, upon learning she had purchased Imagination's game, she became upset and said she would not have purchased the game had she known it was not George's game.

The district court found that the testimony of these witnesses amounted to, at most, *de minimis* evidence of actual confusion. Accordingly, the district court looked at the seventh factor as weighing heavily against a finding of a likelihood of confusion.

The district court's consideration of the actual confusion factor was not in error. The evidence in the record demonstrates that George sells 500,000 LCR games per year. Like *Petro Stopping*, in light of George's huge sales volume, four instances of consumer confusion is at best *de minimis*. 130 F.3d at 95; *cf. Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 639 (7th Cir. 1999) (evidence of only two consumers who were confused was "minimal" and did not prevent dismissal on summary judgment); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092-93 (10th Cir. 1999) (holding that seven examples of actual confusion was *de minimis*). "At worst, the company's failure to uncover more than a few instances of actual confusion creates a presumption against likelihood of confusion in the future." *Petro Stopping*, 130 F.3d at 95 (citation and inter-

nal quotation marks omitted). Accordingly, the seventh factor weighs heavily against a likelihood of confusion.[14]

Factor eight, the quality of the defendant's product, as noted by the district court, has no relevance in this case. It applies in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee*, 81 F.3d at 467. Here, Imagination's goods are priced at or above the prices of George's goods. Accordingly, the district court correctly determined the eighth factor has no relevance in this case.

The ninth factor, the sophistication of the consuming public, similarly is not relevant. In *Sara Lee*, we noted that this factor will only be relevant "when the relevant market is not the public at-large." *Id.* Here, the relevant market is the public at-large, and there is no evidence that persons who buy dice games are any more sophisticated about dice games than those who comprise the market for other ordinary retail goods.

Examining the *Pizzeria Uno* factors, we note that some favor George and some favor Imagination. However, the most significant factor, actual confusion, weighs decidedly against George. This factor, along with the weakness of the LCR

---

[14]George argues that, because it filed its complaint just before Imagination released LCR, there was no opportunity for actual confusion to occur. Thus, according to George, its evidence of four instances of actual confusion creates a genuine issue of material fact. George's no-opportunity argument is flawed. Throughout the pendency of the litigation, George repeatedly sought to submit evidence of actual confusion through motions to file additional evidence, which the district court granted without hesitation. At the time the district court granted summary judgment in July 2008, only four instances of consumer confusion were before the district court, and George presented no evidence that its sales and marketing efforts were slowed by Imagination's entry into the marketplace. Unquestionably, the four instances of consumer confusion, when compared to George's huge sales volume are *de minimis*, at best, for purposes of our actual confusion analysis.

mark, the lack of similarity between the two marks, and the lack of predatory intent, leads to the inescapable conclusion that there is no likelihood of confusion as a matter of law between Imagination's use of LEFT CENTER RIGHT and George's use of LCR. In fact, we are aware of no case where a court has allowed a trademark infringement action to proceed beyond summary judgment where two weak marks were dissimilar, there was no showing of a predatory intent, and the evidence of actual confusion was *de minimis*. Accordingly, the district court did not err in granting summary judgment to Imagination on George's claim that Imagination's use of LEFT CENTER RIGHT federally infringed on George's use of LCR.

B

George also contends that the district court erred when it held that George did not have a valid and protectable mark in LEFT CENTER RIGHT. In rejecting George's contention, the district court concluded that George abandoned all trademark rights in LEFT CENTER RIGHT because the undisputed evidence demonstrated that George had abandoned the use of LEFT CENTER RIGHT as a mark back in 1992.

In general, the party claiming ownership of a mark must be the first to use the mark in the sale of goods. *McCarthy* § 16:1.[15] The party claiming ownership must also use the mark as a trademark, that is, the mark must be used to identify the source of the goods to potential customers. *MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 341 (4th Cir. 2001). Thus, so long as a person is the first to use a particular mark

---

[15]Of course, federal registration helps in this regard, as registration is *prima facie* evidence that the registrant is the owner of the mark. 15 U.S.C. § 1057(b); *id.* § 1115(a). Registration grants a presumption of ownership, dating ownership to the filing date of the federal registration application, and the party challenging the registrant's ownership must overcome this presumption by a preponderance of the evidence. *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 775-76 (9th Cir. 1981).

to identify his goods in a given market, and so long as that owner continues to make use of the mark, he is "entitled to prevent others from using the mark to describe their own goods" in that market. *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985).

However, if the owner of a mark ceases to use the mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been "abandoned." *Emergency One, Inc. v. American FireEagle, Ltd.*, 228 F.3d 531, 535 (4th Cir. 2000). Once abandoned, a mark returns to the public domain and may, in principle, be appropriated for use by others in the marketplace, *Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 412 (7th Cir. 1994), in accordance with the basic rules of trademark priority, *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 627 F.2d 628, 630 (2d Cir. 1980); *see also McCarthy* § 17:1 ("Once held abandoned, a mark falls into the public domain and is free for all to use. While acquiescence may bar suit against one person, abandonment opens rights to the whole world. Abandonment paves the way for future possession and property in any other person.") (footnotes omitted).

A trademark is abandoned when "its use has been discontinued with intent not to resume such use." 15 U.S.C. § 1127. Our case law requires a showing of: (1) non-use by the legal owner; and (2) no intent to resume use in the reasonably foreseeable future by the legal owner. *Emergency One*, 228 F.3d at 535. Three consecutive years of non-use creates a presumption that the legal owner intended not to resume use. *Id.* at 536; *see also* 15 U.S.C. § 1127. This presumption may be rebutted with evidence of either actual use or an intent to resume use. *Emergency One*, 228 F.3d at 536. The ultimate burden of proof remains always on the party claiming a mark has been abandoned. *Id.*

In this case, the evidence, in the light most favorable to George, barely demonstrates that George marketed and sold

a version of the Dice Game under the name LEFT CENTER RIGHT from 1983 until 1991. However, the record is uncontroverted in this respect—some time in 1992, George decided to stop selling its LEFT CENTER RIGHT version of the Dice Game, deciding instead to exclusively sell the LCR version of the game.

George maintains that it has continuously used LEFT CENTER RIGHT as a mark since 1983 and, therefore, it has not abandoned its rights in LEFT CENTER RIGHT. According to George, such use is demonstrated through 1991 by its use of the LEFT CENTER RIGHT version of the Dice Game and from 1992 until the present by its use of the Tagline and the Arrows Design on the LCR version of the Dice Game, which both contain the words "Left," "Center," and "Right." Along a similar vein, George contends that continuous use of LEFT CENTER RIGHT is demonstrated by the fact that LCR is an abbreviation of LEFT CENTER RIGHT. Finally, George contends that continued use is demonstrated through its own continuous verbal use of LEFT CENTER RIGHT since 1983. As this contention goes, since 1983, employees of George, in conversations with customers and other "word-of-mouth" marketing and selling, sometimes have referred to George's version of the Dice Game as LEFT CENTER RIGHT. Appellant's Br. at 52.

The Tagline and Arrows Design that appear on George's packaging prior to Imagination's use of LEFT CENTER RIGHT simply do not use LEFT CENTER RIGHT as a mark. *See* Opinion Appendix B. First, there is no ™ designation next to the Tagline or the Arrows design. While not dispositive, the absence of a ™ designation is telling. Second, both the Tagline and the Arrows design are descriptive in nature, describing to the customer how the game is played. As such, the Tagline and the Arrows Design do not operate as indicators of source. Finally, both the Tagline and the Arrows Design (albeit to a much lesser degree than the Tagline) function as slogans or advertisements for LCR. While an adver-

tisement or a slogan certainly can function as a trademark, it must function as such to be entitled to trademark protection. *MicroStrategy*, 245 F.3d at 343. Here, the Tagline and the Arrows Design do not serve such a dual function. Rather than indicate source, they describe, advertise, and promote the game. Under these circumstances, one must conclude that George has abandoned the LEFT CENTER RIGHT mark as a matter of law.[16]

Turning to George's argument that continuous use of LEFT CENTER RIGHT is demonstrated by the fact that LCR is an abbreviation of LEFT CENTER RIGHT, we note this claim relies on the ability of George to "tack" its prior use of the LEFT CENTER RIGHT mark from 1983 until 1991 onto its current use of the LCR mark. The use of an earlier mark can be tacked onto the use of a subsequent mark only if the previously used mark is "the legal equivalent of the mark in question or indistinguishable therefrom" such that consumers "consider both as the same mark." *Van Dyne-Crotty, Inc. v. Wear-Guard Corp.*, 926 F.2d 1156, 1159 (Fed. Cir. 1991). Furthermore, tacking is permitted "only in rare instances." *Id.* at 1160 (citation and internal quotation marks omitted). Legal equivalence for tacking purposes does not exist simply because the two marks a party seeks to tack are "confusingly similar." *Id.* at 1159. Rather, the marks sought to be tacked must create the same continuing commercial impression. *Id.*

Here, LCR and LEFT CENTER RIGHT are not confusingly similar. As noted earlier, they look and sound different. Moreover, the case law is firmly against the conclusion that LCR and LEFT CENTER RIGHT are legal equivalents for

---

[16]For the same reasons the Tagline and the Arrows Design cannot establish use to prevent abandonment of the LEFT CENTER RIGHT mark, we reject George's contention that Imagination's use of LEFT CENTER RIGHT infringes on George's trademark rights in the Tagline and the Arrows Design, as neither the Tagline nor the Arrows Design were used as a mark on packaging used by LCR prior to Imagination's use of LEFT CENTER RIGHT.

purposes of tacking. *See Data Concepts, Inc. v. Digital Consulting, Inc.*, 150 F.3d 620, 623-24 (6th Cir. 1998) (holding that "DCI" and "dci" were too dissimilar to support tacking); *Van Dyne-Crotty*, 926 F.2d at 1160 (concluding that priority in "CLOTHES THAT WORK. FOR THE WORK YOU DO" could not be tacked onto "CLOTHES THAT WORK"; shorter phrase was not the legal equivalent of the longer mark).

George fares no better with its verbal use argument. This argument rests on George's contention that its own use of LEFT CENTER RIGHT demonstrates continuous use of the mark. Unfortunately for George, we are aware of no case law supporting the proposition that a seller of goods who declines to use a mark as a trademark on the packaging of his goods obtains trademark rights in the mark through its own verbal use. Embracing such a verbal use doctrine would open the door to all varieties of claims where a party took no steps to use a mark on packaging to identify it as the source of the goods to potential customers. Such a result surely runs counter to our reasoning in *MicroStrategy*. *See* 245 F.3d at 341 ("Use of a trademark to identify goods and services and distinguish them from those of others does not contemplate that the public will be required or expected to browse through a group of words, or scan an entire page in order to decide that a particular word, separated from its context, may or may not be intended, or may or may not serve to identify the product.") (citation and internal quotation marks omitted); *id.* at 342 ("A trademark need not be particularly large in size or . . . appear in any particular position on the goods, but it must be used in such a manner that its nature and function are readily apparent and recognizable without extended analysis or research and certainly without legal opinion.") (citation and internal quotation marks omitted); *see also* 15 U.S.C. § 1127 (requiring that, in the context of the sale of goods, the mark must be "placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto").

George makes one other argument attempting to make an end-run around the consequences of its abandonment of the LEFT CENTER RIGHT mark. George argues that it has not abandoned its rights in LEFT CENTER RIGHT because the consuming public started to use LCR and LEFT CENTER RIGHT to exclusively indentify George's version of the Dice Game long before Imagination began selling its version of the Dice Game. In pressing this contention, George relies on the so-called "Public Use" doctrine.

The Public Use doctrine, which is extremely limited in scope, states that abbreviations or nicknames used only by the public can give rise to protectable trademark rights to the owner of a mark which the public has modified. *Nat'l Cable Television Ass'n, Inc. v. American Cinema Editors, Inc.*, 937 F.2d 1572, 1577 (Fed. Cir. 1991); *see also McCarthy* § 7:18 (collecting cases). "Such public use by others inures to the claimant's benefit and, where this occurs, public use can reasonably be deemed use by that party in the sense of a use on its behalf." *Nat'l Cable*, 937 F.2d at 1577-78 (citation and internal quotation marks omitted). The Public Use doctrine was developed because "Americans are prone to abbreviate recognized trademarks and to use nicknames." *McCarthy* § 7:18. Examples of nicknames held protectable as trademarks include Coke for Coca-Cola, *Coca-Cola Co. v. Busch*, 44 F. Supp. 405, 410 (E.D.Pa. 1942), and Bud for Budweiser beer, *Anheuser-Busch, Inc. v. Power City Brewery, Inc.*, 28 F. Supp. 740, 742-43 (W.D.N.Y. 1939).

Although the Public Use doctrine appears at odds with the bedrock trademark principles that "ownership rights flow only from prior appropriation and actual use in the market," *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 356 (6th Cir. 1998), superior rights are granted to the owner of the mark as modified by the public to avoid consumer confusion in the marketplace. *See McCarthy* § 7:18 ("It is public use that will set the stage for confusion, which is the evil to be remedied in trademark cases."). Because of this ten-

sion, the Public Use doctrine generally is confined to instances in which the public modifies a well-known brand into a nickname or abbreviation. Brody, Peter, *What's in a Nickname? Or, Can Public Use Create Private Rights?*, 95 T.M.R. 1123, 1158-62 (2005).[17]

In this case, George is attempting to use the Public Use doctrine to create trademark rights in a descriptive term (LEFT CENTER RIGHT) that is an elongation of an abbreviation (LCR). Such an application is a dramatic expansion of the Public Use doctrine, as the doctrine is applied when the public abbreviates or nicknames a term, not the other way around. The tethering of the Public Use doctrine to nicknames and abbreviations makes perfect sense because an abbreviation or nickname typically adds distinctiveness to the owner's mark. Coke and Bud clearly add distinctiveness to their respective marks. In contrast, an elongation does not add distinctiveness to a mark. "Peanut Butter & Jelly" certainly does not make "PB & J" more distinctive. The same can be said of "Bacon, Lettuce, and Tomato" and "BLT."

Two additional factors counsel against application of the Public Use doctrine in this case. First, George is using the Public Use doctrine as a back-door means of obtaining trademark protection to a mark that is not even protectable. As noted by the district court, the descriptive mark LEFT CENTER RIGHT has not acquired secondary meaning. Second,

---

[17]Outside of the abbreviation and nickname context, the Public Use doctrine has been applied in one other limited circumstance—where a sports franchise relocates to another city and uses the mark prior to the infringer's use. *See Johnny Blastoff, Inc. v. Los Angeles Rams Football Co.*, 188 F.3d 427, 434-35 (7th Cir. 1999) (Public Use doctrine applied when Los Angeles Rams franchise relocated to St. Louis and public had been using St. Louis Rams name in connection with football franchise for several weeks prior to the plaintiff's use). In a sports franchise situation, "a strong presumption of franchise owner priority" is present. *Id.* at 434. Here, obviously, we are not dealing with a franchise relocation situation, so there is no strong presumption in George's priority in LEFT CENTER RIGHT.

the Public Use doctrine does not provide trademark protection where the owner of the mark fails to continue to use the mark. *Cf. Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 812 (2d Cir. 1999) (holding that whatever distinctiveness the nickname "hog" might have once had, it had become generic, in part because of the plaintiff's "deliberate resistance" to linking its products to the word).

## III

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED*

**Appendix A**



## Appendix B



**Appendix C**



**Appendix D**



**Appendix E**

