**ROSETTA STONE LTD., Plaintiff,**

v.

**GOOGLE INC., Defendant.**

**Case No. 1:09cv736 (GBL/TCB).**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 3, 2010.

---

Warren Thomas Allen, II, Skadden Arps Slate Meagher & Flom LLP, Washington, DC, for Plaintiff.

Jonathan David Frieden, Stephen Andrew Cobb, Odin Feldman & Pittleman PC, Fairfax, VA, for Defendant.

## *MEMORANDUM OPINION*

GERALD BRUCE LEE, District Judge..

THIS MATTER is before the Court on Plaintiff's Motion for Partial Summary Judgment as to Liability (Dkt. No. 103) and Defendant's Motion for Summary Judgment (Dkt. No. 112). This case concerns Plaintiff Rosetta Stone Ltd.'s ("Rosetta Stone") allegations that Defendant Google Inc. ("Google") is actively assisting third party advertisers to mislead consumers and misappropriate Rosetta Stone's trademarks by using the trademarks (1) as keyword triggers for paid advertisements and (2) within the title and text of paid advertisements on Google's website. There are five issues before the Court. The first issue is whether Google's practice of auctioning Rosetta Stone's trademarks to third party advertisers for use in their Sponsored Link titles and advertisement text creates a likelihood of confusion to warrant granting summary judgment in favor of Rosetta Stone as to Counts I (trademark/service mark infringement under the Lanham Act), V (trademark infringement under Virginia Law), and VI (unfair competition under Virginia law). Notwithstanding a finding of likelihood of confusion, the second issue is whether Google's use of Rosetta Stone's trademarks as keyword triggers under its advertising program is functional and, therefore, a non-infringing use. The third issue is whether Google intentionally induces third party advertisers to bid on Rosetta Stone's trademarks or knowingly continues to permit advertisers selling counterfeit Rosetta Stone products to use the trademarks in their Sponsored Link titles and advertisement text, despite Rosetta Stone's reports of infringement, to warrant granting summary judgment in favor of Rosetta Stone as to Count II (contributory trademark/service mark infringement under the Lanham Act). The fourth issue is whether Google exercises joint ownership and control over third party advertisers' Sponsored Link titles and advertisement text on its website to warrant granting summary judgment in favor of Rosetta Stone as to Count III (vicarious trade-

mark/service mark infringement under the Lanham Act). The final issue is whether Rosetta Stone sufficiently demonstrates economic loss resulting from a decline in its brand name, which is attributable to Google's practice of auctioning Rosetta Stone's trademarks for profit to third party advertisers, to warrant granting summary judgment in favor of Rosetta Stone as to Count IV (trademark/service mark dilution under the Lanham Act).

The Court grants summary judgment in favor of Google on Counts I, V and VI because no reasonable trier of fact could find that Google's practice of auctioning Rosetta Stone's trademarks as keyword triggers to third party advertisers for use in their Sponsored Link titles and text creates a likelihood of confusion as to the source or origin of Rosetta Stone's goods. Furthermore, because Google uses Rosetta Stone's trademark to identify relevant information to users searching on those trademarks, the use is a functional and non-infringing one. The Court grants summary judgment in favor of Google on Count II because no reasonable trier of fact could find that Google intentionally induces or knowingly continues to permit advertisers selling counterfeit Rosetta Stone products to use the trademarks in their Sponsored Link titles and advertisement text. The Court also grants summary judgment in favor of Google on Count III because no reasonable trier of fact could find that Google exercises joint ownership and control over third party advertisers' Sponsored Links titles and text. Neither Google's employees nor its Query Suggestion Tool directs or influences third party advertisers to bid on Rosetta Stone's trademarks when they subscribe to Google's advertising program. Finally, the Court grants summary judgment in favor of Google on Count IV because there is no genuine dispute of material fact that Rosetta Stone's brand awareness has only increased since Google changed its trademark policy to permit the use of trademarked terms as keyword triggers and as words within Sponsored Link titles and advertisement text.

## I. BACKGROUND

### A. Plaintiff Rosetta Stone Ltd. and the Rosetta Stone Marks

Rosetta Stone is a Virginia-based corporation founded in 1992 that provides technology-based language learning products and services. (Pl.'s Mem. Supp. Partial Summ. J. 1–2.) As the foremost language education company in the United States, Rosetta Stone's language learning products are available in over thirty languages and are used by schools, corporations, government entities and millions of individuals in over 150 countries. (Adams Decl. ¶¶ 10–11.) To preserve its trademark rights, Rosetta Stone obtained federal trademark registration for some of its marks, including: ROSETTA STONE, ROSETTA STONE LANGUAGE LEARNING SUCCESS, *ROSETTA-STONE.COM*, and ROSETTA WORLD (the "Rosetta Stone Marks"). (Eichmann Decl. ¶ 2; May Decl. ¶¶ 2–7, Exs. 1–6.) These Marks have become distinctive and uniquely associated with Rosetta Stone. (Pl.'s Mem. Supp. Summ. J. 3–4.)

In order to build the fame, reputation, and goodwill of its Marks, Rosetta Stone advertises through a variety of media, including television, radio, newspapers, magazines, direct mail, and telephone directories. (Eichmann Decl. ¶¶ 3–6, Exs. 1–3.) It conducts a substantial amount of its business over the Internet using many web-based services, including those offered by Google, and makes a sizeable investment in the development of its online business. (Eichmann Decl. ¶ 6, Exs. 1–3.) Along with promoting its products and ser-

vices via its own website (*www. rosettastone.com*), Rosetta Stone advertises on the websites of third parties. It authorizes resellers such as Amazon.com, Barnes & Noble, and Borders, to sell authentic Rosetta Stone products. (Caruso Decl. Ex. 72 at 147:9–148:18, Ex. 58 at 96:12–98:10.) Specifically, it entered into agreements with Amazon.com and eBay that allow them to use the Rosetta Stone Marks in connection with advertising. (Caruso Decl. Exs. 40–44.)

### B. Defendant Google Inc. and Google's Search Engine

Located in Mountain View, California, Google is an Internet company that owns and operates one of the world's most utilized internet search engines, *www.google. com.* (Spaziano Decl. Ex. 1 (Ans. ¶ 3).) The Internet is a global network of millions of interconnected computers and the World Wide Web is an application running on the Internet that allows for the display of text, images, and sound. (First Am. Compl. ¶ 13.) Much of the information on the World Wide Web is stored in the form of web pages that can be assessed through a computer connected to the Internet (available through commercial Internet service providers or "ISPs") and viewed using a computer program called a "browser," such as Microsoft Internet Explorer. A web page is identified by its own unique Uniform Resource Locator ("URL") or "web address" (*e.g., http://www. rosettastone.com*), which ordinarily includes the website's "domain name" (*e.g., www.rosettastone.com*). (First Am. Compl. ¶ 13.)

Web users searching for a specific company product, service or piece of information, but who do not know the exact domain name or website address where it may be found, may use Google's search engine to locate it. (First Am. Compl. ¶ 25.) A search engine is a computer program that allows web users to search the World Wide Web for websites containing particular content. (First Am. Compl. ¶ 3.) A search engine checks the terms entered into it against its databases and applies a formula or algorithm to produce a search results page that lists the websites that may relate to the user's search terms and their corresponding links. (First Am. Compl. ¶ 25.) To use Google's search engine, a web user need only type in a few words and hit the "enter" key (or click the "Google Search" button) to receive a list of hyperlinks ("links") to web pages that Google identifies as relevant to the search requested. (First Am. Compl. ¶ 4.) The search results generated by Google's search engine are determined by a "natural" or "organic" system that lists results in order of objective relevance to the search terms input into the search engine, with the most relevant websites appearing near the top of the web page. (First Am. Compl. ¶ 26.)

Google's search engine is available not only on its own website but also through other popular websites such as America Online, Netscape, EarthLink, CompuServe, Shopping.com, AT & T WorldNet, and Ask.com. (First Am. Compl. ¶ 34.) In addition, Google invites consumers to affix a "Google Toolbar" at the top of their Internet browsers that allows these users to conduct Google searches even when they are not currently visiting *www.google. com.* (First Am. Compl. ¶ 34.) As such, Google's content network reaches 80% of global internet users, and over 70% of U.S. Internet searches use Google's search engine. (First Am. Compl. ¶ 35.)

When a web user hits the "enter" key, Google not only provides web users with organic search results, it also displays paid advertisements above or alongside the organic search results. (Caruso Decl. Ex. 59

at 202:1–9 & 205:20–206:25, Ex. 76 at 175:22–177:16, Ex. 64 at 112:16–113:1.) These paid advertisements consist of a combination of content and a link to the advertiser's website such that if a user clicks on the link, she will open the advertiser's website, which offers additional information about the advertiser and may provide the user with an option to purchase the advertiser's goods and services. To offer such content-based links, Google relies on at least one of its advertising programs called the AdWords Select Advertising Program ("AdWords Program"). (First Am. Compl. ¶ 36.)

## C. Google's AdWords Program

"Google's AdWords Program" is an auction-style advertising program that displays advertisements to users of Google's search engine in the form of Sponsored Links. (Spaziano Decl. Ex. 1 (Ans. ¶¶ 5 & 36).) The Sponsored Links are displayed above or to the right of the organic search results. (Spaziano Decl. Ex. 1 (Ans. ¶ 28).) Those above the organic search results share a yellow rectangular background while those to the right of the organic search results are separated by a blue line. (Caruso Decl. Exs. 10 & 13.) These Sponsored Links appear in a color, typeface, and font size similar to the search results generated from a web user's query. (Caruso Decl. Exs. 10 & 13; First Am. Compl. ¶ 38.)

Under the AdWords Program, Google offers an advertiser the ability to select certain words or phrases ("keywords") that, combined with the advertisement's quality and the maximum bid price for the advertisement, will trigger a Sponsored Link to the advertiser's chosen website. (Caruso Decl. Ex. 52 at 18:17–20:19, 65:13–66:8, & 100:16–101:1.) Advertisers select the keywords from a list of words or phrases generated algorithmically using Google's keyword tools, of which there are three: (1) Keyword Tool; (2) Query Suggestion Tool; and (3) a trademark-specific version of the Query Suggestion Tool. (Caruso Decl. Ex. 54 at 13:18–14:4, 18:11–17, & 21:25–22:11.) Before the list is displayed to advertisers, however, it is passed through a filter which removes terms that Google entered into the filter as trademarked terms for which Google has received a complaint. (Caruso Decl. Ex. 54 at 19:8–24, 23:22–24:7, & 25:2–7.) Alternatively, advertisers can also select the keywords on their own without relying on the list generated by Google's keyword tools. (Lloyd Decl. Ex. 9 & 11.) If the advertisement's quality and bid price are sufficiently high, it qualifies to be shown on Google.com (Caruso Decl. Ex. 52 at 17:12–21:18, 65:13–66:8, & 100:16–101:1; Spaziano Decl. Ex. 1 (Ans. ¶¶ 29 & 39), Ex. 2 at GOOG–RS–0306288, Ex. 3 at 9.)

For example, using the AdWords Program, Company B, a company that sells children's shoes, can cause Google to display its Sponsored Link whenever a Google user conducts a search using the term, "children's shoes." Company B can also cause its Sponsored Link to appear whenever the user searches for the term "Company A," Company B's competitor, who also sells children's shoes. Consequently, whenever a Google user wishing to buy children's shoes from Company A conducts a search of the term A (Company A's trademark), a Sponsored Link would appear on the search results page, inviting the user to view children's shoes from Company B, Company A's competitor. If the user clicked on Company B's link, Company B's website would open on the screen and the user might be able to purchase children's shoes from Company B. Thus, by participating in the AdWords Program, advertisers are able to place their advertising in front of consumers who identify themselves as interested in

certain products or services offered by the advertisers' companies. (First Am. Compl. ¶ 27.)

### D. Google's Trademark Policy

Google's policy of allowing third party advertisers to purchase specific trademarks as keyword triggers for the Sponsored Links began in 2004. (Lloyd Decl. Ex. 1; First Am. Compl. ¶ 44.) In its Form S–1 Registration Statement to the Securities Exchange Commission, dated April 29, 2004, Google informed its investors of the following:

> In order to provide users with more useful ads, we have recently revised our trademark policy in the U.S. and in Canada. Under our new policy, we no longer disable ads due to selection by our advertisers of trademarks as keyword triggers for the ads.

(Spaziano Decl. Ex. 7). The S–1 Form further states:

> As a result of this change in policy, we may be subject to more trademark infringement lawsuits. . . . Adverse results in these lawsuits may result in, or even compel, a change in this practice which could result in a loss of revenue for us, which could harm our business.

(Spaziano Decl. Ex. 7).

In 2009, Google again revised its trademark policy. (Lloyd Decl. Ex. 1.) Specifically, the AdWords Program now makes two distinct uses of a given keyword: (1) as a trigger to the Sponsored Link advertisement and (2) as part of the advertisement itself. (Lloyd Decl. Ex. 1–2.) The new policy allows, in addition to the brand owner and its authorized licensees, advertisers to include the trademark in the advertisement's text if they (1) resell legitimate products bearing the trademark; (2) sell components, replacement parts, or compatible products corresponding to the trademark; or (3) provide non-competitive information about the goods or services corresponding to the trademark term. (Lloyd Decl. Exs. 2, 4; Caruso Decl. Ex. 55 at 154:6–15.)

To enforce its trademark policy, Google employs a trademark team, known as the Trust and Safety Team, which responds to complaints about advertisements that violate certain conditions of its AdWords Program. (Caruso Decl. Ex. 67 at 7:24–8:19; Lloyd Decl. ¶¶ 9–11.) As a general practice, the Trust and Safety Team works to address problems with fraud and counterfeiting. (Caruso Decl. Ex. 68 at 50:4–51:10, Ex. 53 at 34:21–37:11, Ex. 67 at 108:2–109:16; Louie Decl. ¶¶ 1–5.) The Team responds to notices of counterfeit advertisements on Google's website and takes down any advertisements confirmed to violate its AdWords Program. (Caruso Decl. Exs. 21, 23–25, 28, Ex. 65 at 135:11–138:25.) For example, when Rosetta Stone's Enforcement Manager, Jason Calhoun, informs Google that a particular advertiser is selling counterfeit Rosetta Stone products, Google responds by taking action, including removing the advertisement. (Caruso Decl. Exs. 21, 23–25, 28, Ex. 65 at 135:11–138:25; Calhoun Decl. Exs. B–C.) But despite its efforts, some advertisers have used loopholes in Google's programming to create Sponsored Links that deceive and misdirect Google's users to websites that sell counterfeit Rosetta Stone products or suggest to consumers a connection to Rosetta Stone that does not exist. (First Am. Compl. ¶ 58.)

### E. Procedural History

Based on Google's current trademark policy, Rosetta Stone brings this action alleging that Google, through its AdWords Program, is helping third parties to mislead consumers and misappropriate the Rosetta Stone Marks by using them as keyword triggers for Sponsored Links and

using them within the text or title of the Sponsored Links. (First Am. Compl. ¶¶ 70–124.) Rosetta Stone alleges that by giving third party advertisers under the AdWords Program the right to use the Rosetta Stone Marks or words, phrases, or terms similar to those Marks as keyword triggers that cause Sponsored Links to be displayed, Google is helping these advertisers misdirect web users to websites of companies that (i) compete with Rosetta Stone, (ii) sell language education programs from Rosetta Stone's competitors, (iii) sell counterfeit Rosetta Stone products, or (iv) are entirely unrelated to language education. (First Am. Comp. ¶ 5.) According to Rosetta Stone, Google's conduct amounts to trademark infringement and is driven by an economic incentive to increase the number of Sponsored Links that appear for every term entered into its search engine because Google is paid by its AdWords advertisers on a "cost-per-click" basis. (Spaziano Decl. Ex. 1 (Ans. ¶¶ 37 & 63).)

In its First Amended Complaint, Rosetta Stone alleges seven Counts for relief: I (trademark/service mark infringement under the Lanham Act); II (contributory trademark/service mark infringement under the Lanham Act); III (vicarious trademark/service mark infringement under the Lanham Act); IV (trademark/service mark dilution under the Lanham Act); V (trademark infringement under Virginia Law); VI (unfair competition under Virginia law); and VII (unjust enrichment under Virginia Law). The parties now move for summary judgment on all counts. Because Google filed a Motion to Dismiss Count VII of Rosetta Stone's Amended Complaint[1] (Dkt. No. 94.) before filings its Motion for Summary Judgment, this Memorandum Opinion addresses only Counts I–VI.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, the Court must grant summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505 (emphasis added).

A "material fact" is a fact that might affect the outcome of a party's case. *Id.* at 248, 106 S.Ct. 2505; *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir.2001).

1. The Court addresses Google's Motion to Dismiss Count VII in a separate Memoran-dum Order.

A "genuine" issue concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## III. ANALYSIS

### A. Direct Trademark Infringement Under the Lanham Act [2]

 The first and most contentious issue between the parties is whether Google is liable for direct trademark infringement based on its practice of auctioning the Rosetta Stone Marks to third party advertisers for use in their Sponsored Link titles and advertisement text. On this issue, the Court grants summary judgment in favor of Google because no reasonable trier of fact could find that Google's practice of auctioning Rosetta Stone's trademarks as keyword triggers to third party advertisers creates a likelihood of confusion as to the source or origin of Rosetta Stone's products. Section 32(1) of the Lanham Act provides, in pertinent part:

Any person who shall, without the consent of the registrant—(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the ... advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or (b) reproduce,

counterfeit, copy or colorably imitate a registered mark and apply such ... to be used in commerce upon or in connection with the ... advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant....

15 U.S.C. § 1114(1) (2005). A cause of action for trademark infringement under the Lanham Act requires the plaintiff to prove that (1) it possesses a mark; (2) defendant used the mark; (3) defendant's use of the mark occurred in commerce; (4) defendant used the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) defendant used the mark in a manner likely to confuse consumers as to the source or origin of goods or services. *People for the Ethical Treatment of Animals v. Doughney,* 263 F.3d 359, 364 (4th Cir.2001). Whether consumer confusion is likely depends on the following nine factors: (1) strength or distinctiveness of the mark; (2) similarity of the two marks to consumers; (3) similarity of the goods and services the marks identify; (4) similarity between the facilities used by the markholders; (5) similarity of advertising used by the markholders; (6) defendant's intent; (7) actual confusion; (8) quality of the defendant's product; (9) sophistication of the consuming public. *George & Co., L.L.C. v. Imagination Entm't Ltd.,* 575 F.3d 383, 393 (4th Cir.2009). Not all factors, however, are relevant or weighed equally. *Id.* (*citing Anheuser–Busch, Inc. v. L & L Wings, Inc.,* 962 F.2d 316, 320 (4th Cir.1992)).

 Here, the parties do not dispute the first four trademark infringement ele-

**2.** The Court addresses Counts I, V and VI together because the test for trademark infringement under the Lanham Act is essentially the same as that for common law trademark infringement and unfair competition under Virginia law.

ments. (Pl.'s Mem. Supp. Partial Summ. J. 15–20; Def.'s Mem. Supp. Summ. J. 8–23.) The inquiry, therefore, is whether Google's practice of auctioning the Rosetta Stone Marks as keyword triggers for Sponsored Links and allowing their use within the Sponsored Links' text or title is likely to create confusion among consumers as to the source or origin of Rosetta Stone's goods or services. Specifically, only three of the nine confusion factors are in dispute: (1) defendant's intent; (2) actual confusion; and (3) the consuming public's sophistication. (Pl.'s Mem. Supp. Partial Summ. J. 17–26; Def.'s Mem. Supp. Summ. J. 15–20.) The Court addresses these factors in turn.

### 1. *Intent*

No genuine dispute of material fact exists which would cause a reasonable juror to find that Google intended to confuse potential purchasers of Rosetta Stone's products by auctioning the Rosetta Stone Marks as keyword triggers or allowing their use within the Sponsored Link titles and text. Moreover, there is no evidence that Google is attempting to pass off its goods or services as Rosetta Stone's. "[T]he relevant intent in trademark cases is not merely an intent to profit ... but an 'intent to confuse the buying public.'" *Anheuser–Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 321 (4th Cir.1992) (quoting *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir.1984)). Intent is generally shown by the defendant's efforts to create knock-offs and pass them off as those of other's. *See Pizzeria Uno*, 747 F.2d at 1535 ("[O]ne intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion."); *Best & Co. v. Miller*, 167 F.2d 374, 377 (2d Cir.1948), *cert. denied*, 335 U.S. 818, 69 S.Ct. 39, 93 L.Ed. 373 (1948) ("If the defendant selects a trademark or trade name similar to the plaintiff's with intent to palm off his wares as those of the plaintiff, proof of his intent may be strong evidence of ... the likelihood of confusion.").

In simplified terms, Google's popular search engine aggregates information and provides advertising space. This is akin to a newspaper or magazine selling advertising space. To attract advertisers, Google created a system for displaying advertisements that would be economically profitable for its company and paid advertisers. It does not, however, sell Google-made products on its website. Web users do not visit Google's website to buy Google products because Google does not sell products. Any argument that Google is trying to palm off its goods as those of Rosetta Stone's is, therefore, unfounded.

To prove that Google unlawfully intended to trade on the Rosetta Stone Marks, Rosetta Stone points to Google's knowledge that use of trademarked keywords in the text of Sponsored Links can generate more revenue. (Spaziano Decl. Ex. 18 at GOOG–RS–0309882 & Ex. 19; Pl.'s Mem. Supp. Summ. J. 23.) Rosetta Stone insists Google revised its trademark policy in 2009 knowing that the change would result in higher click-through rates. (Spaziano Decl. Ex. 17.) However, as the Fourth Circuit reasoned in *Anheuser–Busch*, evidence of financial gain alone is insufficient evidence of intent. 962 F.2d at 322. There, the court reversed the district court's grant of plaintiff beer manufacturer's motion for judgment notwithstanding the verdict that defendant T-shirt distributor committed trademark infringement. *Id.* While recognizing that the defendant's primary motive in creating the T-shirt design was to make a profit, the court explained that an intent to profit is not the same thing as an intent to confuse. *Id.* ("We cannot assume that the commercial

success of the ... T-shirt resulted from consumer confusion; consumers may have been moved to buy the T-shirt by the simple fact that they were amused by the cleverness of its design.") Likewise, evidence that Google stands to make more money under its current trademark policy, absent more, cannot meet Rosetta Stone's burden of proving that Google used the Rosetta Stone Marks with intent to confuse the buying public.

An alleged infringer may intend to benefit from the trademark without ever intending to cause consumer confusion. *Id.* Google's intent to increase its earnings does not necessarily demonstrate an intent to mislead or confuse potential buyers of Rosetta Stone's products. In fact, it is in Google's own business interest, as a search engine, not to confuse its users by preventing counterfeiters from taking advantage of its service. Google's success depends on its users finding relevant responses to their inquiries. (Caruso Decl. Ex. 76 at 175:22–177:16; Def.'s Mem. Opp'n Summ. J. 19.) It does not make money from advertisements of counterfeit Rosetta Stone products because counterfeiters generally use stolen credit cards to secure the advertising, and battling such counterfeiters is a drain on Google's resources. (Lloyd Decl. ¶ 9; Louie Decl. ¶¶ 3–6.) Even if it is true that Google stands to profit financially from higher click-through rates, its long term financial loss would far exceed its immediate gains if it provided search services without regard to possible counterfeiting operations. If Google intentionally confuses its users and deprives them of a positive experience, traffic at its website will decrease, causing it to lose revenue.

Moreover, Google argues it revised its trademark policy, in part, because it developed a technological tool by which the websites linking to advertisements on *www.google.com* could be automatically checked to assess the website's status as a reseller or informational site before an advertisement containing a monitored trademark term would be displayed (Caruso Decl. Ex. 62 at 80:18–81:5 & 88:16–90:22; Lloyd Decl. Ex. 5). This technological feasibility minimized the work of Google's advertising and support team, thereby leaving more time for them to focus on securing additional advertisements. Consequently, it cannot be shown that Google's intent in providing third party advertisers with the opportunity to bid on the Rosetta Stone Marks as keyword triggers violates the Lanham Act or related statutes.

## 2. *Actual Confusion*

The parties agree that consumer actual confusion as to the source or origin of goods is the most important factor and the best evidence of likelihood of confusion. (Pl.'s Mem. Supp. Summ. J. 20; Def.'s Mem. Opp'n Summ. J. 18.) In this vein, Rosetta Stone relies on two cases for its position that Google's trademark policy generally results in a likelihood of confusion. (Pl.'s Mem. Supp. Summ. J. 20–21; Pl.'s Reply Mem. Supp. Summ. J. 10.) In *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 459 (4th Cir.1996), a manufacturer of hosiery bearing the "L'eggs" trademark brought suit against a competitor which marketed a "Leg Looks" brand of hosiery. The plaintiff presented six instances of actual confusion by women who bought Leg Looks® under the impression that it was a Leggs® product. *Id.* at 466. The record included consumer market surveys indicating that about 30–40% of consumers throughout the nation were confused as to the source of the product, by the similarity of the L'eggs® and Leg Looks® marks. *Id.* at 467. In finding infringement, the court determined the confusion element based on the surveys

which showed a 30–40% consumer confusion frequency. *Id.*

Decided well before Google went public in 1998 and before Google's search engine gained widespread popularity, *Sara Lee* is important for the legal consequence following a detailed set of facts which is vastly different from what the Court is faced with in this case. At first blush, *Sara·Lee* is distinguishable in at least two ways. First, Rosetta Stone and Google are not direct competitors in the language-learning software market. Second, the record here is devoid of consumer confusion evidence amounting to 30–40%. Rather, Rosetta Stone's evidence of actual confusion—testimonies of five individuals out of more than 100,000 impressions over six years—is *de minimis*. See *George & Co. L.L.C. v. Imagination Entm't*, 575 F.3d at 398 (affirming summary judgment of no infringement where plaintiff came forward with only four instances of confusion among 500,000). Since Google revised its trademark policy in 2004, more than 100,000,000 advertisement impressions have been triggered on Google's search results page through the keyword use of the Rosetta Stone Marks. (Def.'s Mot. Supp. Summ. J. 7.) Rosetta Stone only points to Google's own internal studies and the testimonies of five individuals who claim to be confused by a Sponsored Link displayed on a Google search results page when they each conducted a search for the term "Rosetta Stone." However, Rosetta Stone's evidence of statements made by Google employees about Google's 2004 trademark policy and internal experiments concerned consumer impressions of advertisements that made use of third party trademarks which did not include a Rosetta Stone Mark. (Spaziano Decl. Ex. 8–12 & 16; Spaziano Decl. Tab A at Hagan Dep. 93:18–94:5, Sept. 30, 2004.) None of the five individuals who claim to be confused referenced an advertisement that conformed to Google's policies—i.e., used the Rosetta Stone Marks in connection with advertising genuine goods. (Caruso Decl. Ex. 56 at 13:4–16:15, Ex. 57 at 13:9–24:6, Ex. 71 at 13:3–18:14, Ex. 74 at 11:4–22 & 71:22–73:21; Spaziano Decl. Exs. 8–12 & 16; Spaziano Decl. Tab A at Hagan Dep. 93:18–94:5, Sept. 30, 2004, Jeffries Dep. 75:5–79:21, Porter Dep. 49:16–55:3, Thomas Dep. 70:8–73:21; Pl.'s Mem. Supp. Summ. J. 20–21.)

*X–IT Products, L.L.C. v. Walter Kidde Portable Equipment, Inc.*, 155 F.Supp.2d 577 (E.D.Va.2001) is equally distinguishable. There, the plaintiff filed an eight-count complaint against the defendant for allegedly infringing on the plaintiff's packaging, sell-sheets, and Power–Point presentation of its residential escape ladder. *Id.* at 597. Denying summary judgment for both parties on the Lanham Act claim, the court looked to two actual instances of confusion and a survey conducted by the plaintiff's marketing expert showing a 40% confusion rate. *Id.* at 624. The court noted a complete absence in the defendant's re cord of any direct rebuttal evidence. *Id.* Unlike the *X–IT* defendant, Google provides rebuttal evidence in the form of declarations of various employees familiar with Google's search engine and advertising programs. (Caruso Decl.; Lloyd Decl.; Louie Decl.)

As to the five witnesses who allegedly purchased counterfeit Rosetta Stone products after conducting a search on Google, rebuttal evidence shows that all five testified to knowing that they were not purchasing the products directly from Rosetta Stone. (Caruso Decl. Ex. 56 at 13:4–16:15, Ex. 57 at 13:9–24:6 & 101:1–8, Ex. 71 at 13:3–18:14, Ex. 74 at 11:14–22, 71:22–73:21, & 74:12–75:12; Spaziano Decl. Tab A at Doyle Dep. 11:15–14:6, 15:4–16:15, & 24:6–11, Dubow Dep. 15:2–19:20, 23:19–24:20, 32:20–33:7, & 38:18–43:10, Jeffries Dep.

13:5–14:17, 20:2–21:2, 22:12–23:2, & 24:18–26:2, Porter Dep. 21:11–22:12, Thomas Dep. 20:4–28:5 & 75:7–12.) Thus, none of the Rosetta Stone witnesses were confused about the source of their purchase but only as to whether what they purchased was genuine or counterfeit. They were not confused by the Sponsored Links, but by the confusing nature of the websites from which they purchased. (Caruso Decl. Ex. 56 at 13:4–17:16, Ex. 57 at 23:2–24:20, Ex. 71 at 13:3–19:22, Ex. 74 at 71:18–73:21.) In particular, two of the witnesses could not discern between the links offering genuine Rosetta Stone products and counterfeit ones. (Caruso Decl. Ex 57 at 117:10–21, Ex. 74 at 16:4–17:5; Spaziano Decl. Tab A at Dubow Dep. 117:10–21, Thomas Dep. 32:9–43:19.) Additionally, one of the witnesses purchased the counterfeit software through an organic search and another disposed of the software, thereby preventing an investigation of its authenticity (Caruso Decl. Ex 74 at 15:2–18:3, 70:8–13, & 72:16–20; Spaziano Decl. Tab A at Dubow Dep. 79:11–81:11, Thomas Dep. 47:12–18).

Rosetta Stone's contention that it has presented anecdotal evidence of numerous examples of actual confusion is undermined by the record. Evidence of complaints to Rosetta Stone's customer care center from individuals who purchased counterfeit software between December 9, 2009 through March 8, 2010 rest on the declarations and interrogatory responses of Rosetta Stone's employees. (Calhoun Decl. ¶ 9; Spaziano Opp'n Decl. Ex. 38; Pl.'s Mem. Opp'n Summ. J. 11.) However, a review of the documents referenced in Mr. Calhoun's declaration shows that the record of complaints identify sources such as Craigslist and spam emails, not Google, as the means by which the allegedly counterfeit products were located. (Le Decl. ¶¶ 3–4.) Similarly, the testimony of Google lawyers concerning screen shots pre-

sented at their deposition is inadequate when their responses reflect a mere uncertainty about the source of a product rather than actual confusion. (Lien Decl. Ex. 25 at 189:23–190:19 & 194:1–195:15, Ex. 30 at 159:21–163:11.) Finally, Dr. Kent Van Liere's survey provides unreliable evidence of actual confusion because the result contained a measure of whether respondents thought Google "endorsed" a Sponsored Link, a non-issue. Dr. Van Liere's opinion relied on responses to the question of whether a given link perceived by respondents to offer Rosetta Stone products for sale was "endorse[d]" by Rosetta Stone, which is not the same as confusion as to the source or origin of the products. (Caruso Decl. Ex. 45–C at Questionnaire 3–4.) Accordingly, on the point of actual confusion, the Court necessarily finds in Google's favor.

### 3. *Consuming Public's Sophistication*

■ Contrary to Rosetta Stone's contention, the relevant market here is not the public at-large, but only potential buyers of its products, whose sophistication, therefore, is a factor in the Court's analysis. If the typical consumer in the relevant market is sophisticated in the use of or possesses an expertise regarding a particular product, his sophistication or expertise may be pertinent in determining the likelihood of confusion. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127–28 (4th Cir.1990) (reversing the district court's finding of summary judgment for defendant because the court failed to consider consumer sophistication). Such sophistication may be shown by evidence of expert opinions or surveys. *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir.2005). A court may also "reach a conclusion about consumer sophistication based solely on the nature of the product or its price." *Id.* ("Unhurried consumers

in the relaxed environment of the liquor store, making decisions about $12 to $24 purchases, may be expected to exhibit sufficient sophistication to distinguish between Star's and Barcardi's products, which are differently labeled.") (citation omitted).

As the record reflects, Rosetta Stone's products cost approximately $259 for a single-level package and $579 for a three-level bundle. (Caruso Decl. Ex. 53 at 115:20–116:5.) Its target market is comprised of well-educated consumers willing to invest money and energy in the time-intensive task of learning a language. (Caruso Decl. Exs. 31 & 34, Ex. 69 at 86:20–88:1.) Consequently, it cannot encompass the public at large but only web users who would type in a search query consisting of a Rosetta Stone Mark, and who must necessarily have unaided recall of the Marks. (Caruso Decl. Ex. 33; Def.'s Opp'n 20.) These same consumers who are willing to spend hundreds of dollars on language-learning software would reasonably take care in making such a decision. Given the time commitment of learning a language, they are more likely to spend time searching and learning about Rosetta Stone's products. (Lien Decl. Ex. 36 at 95:13–97:11.) Their expertise and sophistication would tend to demonstrate that they are able to distinguish between the Sponsored Links and organic results displayed on Google's search results page. Therefore, this factor strongly favors Google.

Balancing all of the disputed likelihood of confusion factors, the Court concludes that Google's use of the Rosetta Stone Marks does not amount to direct trademark infringement under Counts I, V and VI.

B. *Functionality Doctrine*

 Notwithstanding a favorable finding for Google under the relevant infringement elements, the functionality doctrine protects Google's use of the Rosetta Stone Marks as keyword triggers. The functionality doctrine provides that a product feature is functional "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32, 121 S.Ct. 1255, 149 L.Ed.2d 164 (2001) (citation and internal quotation omitted) (finding that whether the product configuration is a competitive necessity is an incomplete test for functionality, as a court must also consider whether the product feature is essential to the use or purpose of the device or affects its cost or quality). The doctrine "prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995).

Although *TrafFix* and *Qualitex* are cases where the functional element of the mark holder's product was present in both parties' products, the principal theory is the same—allowing competitors a monopoly on functional uses would inhibit legitimate competition. *Id.* Applying this principle to a search engine, courts have recognized its role as a valuable information provider. *See Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 803–04 (9th Cir. 2002) ("Searchers would have a much more difficult time locating relevant websites if they could do so only by correctly guessing the long phrases necessary to substitute for trademarks."); *see also Designer Skin, L.L.C. v. S & L Vitamins, Inc.*, 560 F.Supp.2d 811, 819 n. 7 (D.Ariz. 2008) (citation omitted) ("[I]t would seem more remarkable still, and a pity, if the

law, in its over-exuberant giddiness as it thrashes about with mark-type conflicts in cyberspace, should kill [readily available Internet directories and search engines].")

Here, Google uses trademarked keywords, including the Rosetta Stone Marks, to identify relevant Sponsored Links. This use is no different than the use of a Google search query to trigger organic search results relevant to the user's search. In both cases, a search term like "Rosetta Stone" will return a string of Sponsored Links and organic links on Google's search results page. The keywords, therefore, have an essential indexing function because they enable Google to readily identify in its databases relevant information in response to a web user's query. *See Sega Enters. Ltd. v. Accolade, Inc.,* 977 F.2d 1510, 1531 (9th Cir.1992) (finding that use of the plaintiff's trademark initialization sequence to achieve compatibility was functional because interoperability could not be achieved without the trademark sequence); *see also Compaq Computer Corp. v. Procom Tech., Inc.,* 908 F.Supp. 1409, 1423 (S.D.Tex.1995)(finding that the word "Compaq" inserted in computer code for purposes of compatibility was functional). This is especially important as advertisers rely on the keywords to place their products and services before interested consumers. Moreover, the keywords affect the cost and quality of Google's AdWords Program because absent third party advertisers' ability to bid on trademarked terms as keyword triggers, Google would be required to create an alternative system for displaying paid advertisements on its website—a system which is potentially more costly and less effective in generating relevant advertisements. In terms of encouraging competition, the keywords also serve an advertising function that benefits consumers who expend the time and energy to locate particular information, goods, or services, and

to compare prices. Google's search engine provides consumers with a highly useful means of searching the internet for products and competitive prices. If Google is deprived of this use of the Rosetta Stone Marks, consumers would lose the ability to rapidly locate potentially relevant websites that promote genuine Rosetta Stone products at competitive prices. Consequently, because the Court is persuaded that Google's particular use of trademarked keywords as triggers for paid advertisements is functional, and no prohibition exists otherwise, the Court holds that the functionality doctrine prevents a finding of infringement.

### C. Contributory Trademark Infringement Under the Lanham Act

 On the issue of contributory trademark infringement, the Court finds that no reasonable trier of fact could find that Google intentionally induces or knowingly continues to permit third party advertisers selling counterfeit Rosetta Stone products to use the Rosetta Stone Marks in their Sponsored Link titles and advertisement text. To prevail on a contributory trademark infringement claim, a plaintiff must show that the defendant "intentionally induces another to infringe a trademark, or [ ] continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement...." *Inwood Labs., Inc. v. Ives Labs., Inc.,* 456 U.S. 844, 854, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982). Although facially applicable to manufacturers and distributors of goods, courts have applied *Inwood's* test for contributory trademark infringement "to a service provider if he or she exercises sufficient control over the infringing conduct." *Tiffany Inc. v. eBay Inc.,* 600 F.3d 93, 104 (2d Cir.2010) (citing *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980,

984 (9th Cir.1999)); *see Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.,* 955 F.2d 1143, 1148–49 (7th Cir. 1992) (treating trademark infringement as a "species of tort," the court analogized a swap meet owner whose vendors sold infringing Hard Rock Cafe T-shirts to a licensor on whom the common law "imposes the same duty ... [as *Inwood* ] imposed on manufacturers and distributors"); *see also Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 265 (9th Cir. 1996) (finding *Hard Rock Cafe's* application of the *Inwood* test for contributory trademark infringement to be "sound").

As proof of contributory infringement, Rosetta Stone points to Google's Query Suggestion Tool (the trademark-specific version launched after Google changed its trademark policy in 2009) and its purported allowance of known infringers to bid on the Rosetta Stone Marks. (Caruso Decl. Ex. 61 at 53:17–61:1; Spaziano Decl. Ex. 1 (Ans.¶ 57), Ex. 18 at GOOG–RS–0309888–0309893, Exs. 21–23; Spaziano Decl. Tab A at Gultekin Dep. 123:8–124:4; Calhoun Decl. ¶¶ 4–6 & 8, Exs. B–D.) First, Rosetta Stone argues that the Query Suggestion Tool's function of generating suggested keywords for advertisers encourages them to bid on brand names, which directly induces advertisers to infringe the Rosetta Stone Marks. (Spaziano Decl. Exs. 19–20.) Second, Rosetta Stone argues that by allowing counterfeiters to open AdWords accounts and to bid on the Rosetta Stone Marks, despite receiving notice of their counterfeit status, Google is supplying a service to those it knows or has reason to know is engaging in trademark infringement. (Spaziano Decl. Exs. 21–23; Calhoun Decl. ¶¶ 2, 4–5, 8, Exs. B–D.) According to Rosetta Stone, Google's knowledge of the ongoing infringement is evident from its Form S–1 Registration Statement to the Securities Exchange Commission, which predicted that Google "may be sub-

ject to more trademark infringement lawsuits...." (Spaziano Decl. Ex. 7.) To illustrate, Rosetta Stone proffers evidence of a spreadsheet that Google received which reflects the dates when Rosetta Stone advised Google that a Sponsored Link was fraudulent, the domain names associated with each such Sponsored Link, the text of each Sponsored Link, and the date and substance of Google's response. (Caruso Decl. Ex. 28; Calhoun Decl. ¶ 5, Ex. C.) As documented, from September 3, 2009 through March 1, 2010, Rosetta Stone notified Google of approximately 200 instances of Sponsored Links advertising counterfeit Rosetta Stone products. (Calhoun Decl. ¶ 4, Exs. C–D; Pl.'s Mem. Supp. Summ. J. 11.) Rosetta Stone contends that even after being notified of these websites, Google continued to allow Sponsored Links for other websites by these same advertisers to use the Rosetta Stone Marks as keyword triggers and in the text of their Sponsored Link advertisements. For example, between October 2009 to December 2009, 110 different Sponsored Links purportedly selling Rosetta Stone products used "Rosetta Stone" as a keyword trigger, and most of the Links included "Rosetta Stone" or "Rosettastone" in their display. Registered to the same individual, these 110 Links were displayed on 356,675 different search-results pages. (Calhoun Decl. Ex. D at GOOG–RS–011–000114 to GOOG–RS–011–000187.)

The Court, however, is unpersuaded by Rosetta Stone's arguments. First, the mere existence of a tool that assists advertisers in optimizing their advertisements does not, in itself, indicate intent to induce infringement. Google's Query Suggestion Tool operates by searching or indexing the particular website identified by an advertiser and returning a limited number of keyword ideas for websites not affiliated with the URL. (Spaziano Decl. Ex. 18 at

GOOG–RS–0309888–0309893.) Before the list of keyword ideas is provided to the advertisers, Google informs them that they are responsible for the keywords selected and for ensuring that their use of the keywords does not violate any applicable laws. (Caruso Decl. Ex. 54 at 19:8–16, 21:25–22:11, & 23:22–24:18; Lien Decl. Ex. 29 at 40:25–42:11 & 58:1–60:1, Ex. 30 at 124:10–17 & 125:11–20; Lloyd Decl. Exs. 5 & 12.) It is no secret that Google is in the business of selling advertising space on its website and profits from AdWords advertisers on a "cost-per-click" basis. Google therefore has an economic incentive to increase the number of advertisements and links that appear for every term entered into its search engine. It would be good business practice for Google to encourage advertisers to bid on keywords that they know will result in higher click-through rates. This desire for economic gain is common in all businesses. Google is no different. A desire for economic gain alone does not translate into contributory trademark infringement.

Second, there is no evidence that Google is supplying a service to those it knows or has reason to know is engaging in trademark infringement. In a recent case from the Second Circuit involving eBay Inc., a company that operates an online auction and shopping website, the court found that despite eBay's promotion of certain vendors of premium branded jewelry and its encouragement to those vendors to take advantage of the demand for Tiffany merchandise, its relationship with third parties' advertisements is insufficient to warrant a finding of contributory trademark infringement. *Tiffany Inc. v. eBay Inc.*, 600 F.3d 93, 107–09 (2d Cir. 2010). Tiffany failed to demonstrate that eBay was supplying services to individuals who it knew sold counterfeit Tiffany goods. *Id.* eBay's generalized knowledge of infringement of a seller's trademark on its website was insufficient to impose upon eBay an affirmative duty to remedy the problem. *Id.* Absent evidence showing that eBay had specific contemporary knowledge of which particular listings were infringing or would infringe in the future, eBay could not be contributorily liable. *Id.*

Like Tiffany, Rosetta Stone fails to show that Google knew of the alleged infringing activity by its AdWords advertisers. There is little Google can do beyond expressly prohibiting advertisements for counterfeit goods, taking down those advertisements when it learns of their existence, and creating a team dedicated to fighting advertisements for counterfeit goods. Google has worked closely with law enforcement and brand owners to combat counterfeiting because it knows that those advertisements can create a bad experience for web users, who Google ultimately relies on for its business. (Caruso Decl. Exs. 21, 23–25, & 28, Ex. 65 at 135:11–138:25, Ex. 67 at 7:24–8:19 & 108:2–109:16, Ex. 68 at 50:4–51:10, Ex. 53 at 36:5–37:16; Lloyd Decl. ¶¶ 10–11 & Ex. 6; Louie Decl. ¶¶ 4–6; Calhoun Decl. Exs. B–D.) It would run counter to good business practice for Google to encourage and provide advertising space to those it knows are infringing on the Rosetta Stone Marks. Similar to eBay's inability to detect which vendors were genuine, Google has no mechanism for detecting which advertisers sold counterfeit Rosetta Stone products. As Rosetta Stone admits, it cannot determine if a Rosetta Stone product is a counterfeit without physically inspecting it. (Pl.'s Mem. Opp'n Summ. J. 4.) Even with eBay's knowledge of the high rate of Tiffany counterfeits, the Second Circuit did not impute the degree of specific knowledge necessary for liability. *Tiffany*, 600 F.3d at 109. In two surveys conducted in 2004 and 2005 to assess the extent of counterfeit

merchandise being sold on eBay's site, Tiffany found that 73.1% of the purported Tiffany goods purchased under the 2004 survey and 75.5% of those purchased under the 2005 survey were counterfeit.[3] *Id.* at 97. eBay also received thousands of Notice Of Claimed Infringement Forms—online forms that allow intellectual property right owners to report to eBay when they have good faith belief that a listed item infringed on a copyright or trademark. *Id.* at 106. Comparing the evidence of knowledge attributed to eBay to the roughly 200 notices Google received of Sponsored Links advertising counterfeit Rosetta Stone products on its search results pages, the Court necessarily holds that Rosetta Stone has not met the burden of showing that summary judgment is proper as to its contributory trademark infringement claim.

### D. Vicarious Trademark Infringement Under the Lanham Act

 Rosetta Stone's claim for vicarious trademark infringement also fails because Google has no control over third party advertisers' Sponsored Links or their use of the Rosetta Stone Marks in the advertisement text. Absent an agency relationship, vicarious liability can only be imposed if the defendant and infringer "exercise joint ownership or control over the infringing product." *Perfect 10, Inc. v. Visa Int'l Serv. Assoc.*, 494 F.3d 788, 807 (9th Cir.2007) (quoting *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d at 1150 (reasoning that vicarious liability is a joint-tortfeasor theory of liability)). In this case, Rosetta Stone would have to show that, aside from providing a list of keywords to its AdWords advertisers to choose from, Google has joint own-

ership or controls the alleged infringing advertisements appearing on its website.

Rosetta Stone's reliance on *GEICO v. Google, Inc.*, 330 F.Supp.2d 700, 705 (E.D.Va.2004) offers little assistance. There, the court addressed a motion to dismiss and ended its analysis by testing the sufficiency of GEICO's allegations that Google monitored and controlled third-party advertisements after selling to the advertisers links to trademarked terms. *Id.* at 702. While the court found that GEICO sufficiently stated a claim for vicarious infringement, it did not address the merits of the claim. *Id.* Thus, contrary to Rosetta Stone, GEICO had to satisfy a lower burden of proof. Relying on *Perfect 10*, Rosetta Stone also argues that Google is vicariously liable because it has a legal right to stop the infringing conduct and the ability to do so, but fails to act. (Spaziano Decl. Tab A at Hagan Dep. 27:3–18, Mar. 5, 2010, Lloyd Dep. 62:4–22, Louie Dep. 25:01–27:17, 28:2–11, 33:19–34:19, & 37:4–8; Spaziano Decl. Ex. 1 (Ans. ¶¶ 41, 43, & 56); Calhoun Decl. ¶¶ 6 & 8, Exs. B–D.) This standard is inapplicable here because *Perfect 10* concerned a plaintiff's allegations of *copyright* infringement of its thumbnail images of nude models. 494 F.3d at 807. Finding that the plaintiff was unlikely to succeed on the merits of its vicarious infringement claims against the defendant internet retailer, the court explained that a financial relationship is insufficient to establish joint ownership and control. *See id.* at 807–08. Thus, the mere fact that Google has a financial relationship with the alleged infringers does not demonstrate Google's control of the Sponsored Links appearing on its website.

Google is not engaged in the business of selling goods but in selling space on a

---

**3.** The district court found that the surveys were methodologically flawed and of questionable value. 600 F.3d at 97.

search page which happens to be a prime location for advertisers wishing to display their advertisements to online shoppers. This is no different than building owners in New York's Times Square who sell space for billboards. Given Times Square's high pedestrian and vehicular traffic, billboards located there offer advertisers great visibility, just as Google's popular search engine offers third party advertisers a great opportunity to display their advertisements for goods and services. Aside from their location and size, advertisement by billboards also allows creative "customizing" through extensions and embellishments, a feature similar to a third party advertiser's ability to create the content of their Sponsored Link on Google's website.

Without evidence that Google's Keyword Tools or its employees direct or influence advertisers to bid on the Rosetta Stone Marks, Rosetta Stone has not shown that Google controls the appearance and content of the Sponsored Links and the use of the Rosetta Stone Marks in those Links. Therefore, vicarious liability cannot be imposed on Google.

### E. Trademark Dilution Under the Lanham Act

■ Insofar as Google does not sell language learning software, it cannot be held liable for trademark dilution. Additionally, Rosetta Stone fails to show trademark dilution where its brand awareness has only increased and where the reputation of its Marks has not been harmed since Google changed its trademark policy in 2004. Under the Trademark Dilution Revision Act ("TDRA"), which removed a plaintiff's obligation to show proof of economic loss, a markholder is "entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or

trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark[.]" 15 U.S.C. § 1125(c)(1) (2006); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, L.L.C.,* 507 F.3d 252, 264 n. 2 (4th Cir. 2007). To establish trademark dilution, Rosetta Stone must prove: (1) its famous Marks are distinctive; (2) Google uses a mark in commerce that allegedly dilutes the famous Marks; (3) a similarity exists between the Rosetta Stone Marks and Google's mark giving rise to an association between the marks; and (4) the association is likely to impair the distinctiveness or reputation of the Rosetta Stone Marks. *Louis Vuitton,* 507 F.3d at 264–65 (listing the elements of a trademark dilution claim under the TDRA). At dispute are the first, third, and fourth elements of Rosetta Stone's claim.

As to the first element, the Rosetta Stone Marks are famous and have been since at least 2009, when Rosetta Stone's brand awareness reached 75%. (Caruso Decl. Ex. 69 at 111:6–12 & 112:1–7, Ex. 30–34, Ex. 60 at 131:6–132:6; Def.'s Mot. Summ. J. 6 & 26–27; Pl.'s Opp'n 24.) The Marks need not have been famous when Google revised its trademark policy in 2004. Instead, Rosetta Stone must only show that at any time after its Marks became famous, Google began using a mark or trade name in commerce that was likely to cause dilution of the Rosetta Stone Marks. § 1125(c)(1). As to the third element, Rosetta Stone does not argue that Google uses a mark similar to the Rosetta Stone Marks on *Google's own* goods or services. (Pl.'s Opp'n 25.) The TDRA provides that a claim for dilution is not actionable if it involves "[a]ny fair use ... of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with ... advertising or promotion that permits consumers to

compare goods or services[.]" § 1125(c)(3)(A) (emphasis added). Nonetheless, Rosetta Stone relies on cases involving defendants who used plaintiffs' marks to capitalize on the plaintiffs' fame and boost the defendants' own goods or services. *Diane Von Furstenberg Studio v. Snyder*, No. 1:06cv1356 (JCC), 2007 WL 2688184, at *4 (E.D.Va. Sept. 10 2007) (finding no dispute that defendants used the identical DVF mark on the inferior-quality dresses they sold and that such act was likely to cause dilution of the DVF mark); *People for the Ethical Treatment of Animals, Inc. v. Doughney*, 113 F.Supp.2d 915, 920 (E.D.Va.2000) (finding the defendant guilty of blurring the famous PETA Mark because he used an identical mark to mentally associate PETA.ORG to that mark), *aff'd*, 263 F.3d 359, 369 (4th Cir.2001). Absent proof that Google uses the Rosetta Stone Marks to identify its *own* goods and services, the Court finds that Google is not liable for trademark dilution.

Even if the Court adopts the argument that liability under § 1125(c) may be imposed for Google's sale of the Rosetta Stone Marks, Rosetta Stone nonetheless fails to satisfy the final element of its trademark dilution claim—that the association between the marks is likely to impair the distinctiveness of the famous marks or is likely to harm the reputation of the famous marks. *Louis Vuitton*, 507 F.3d at 265. If there is evidence that the association is likely to impair the distinctiveness of the Rosetta Stone Marks, there may be a dilution by blurring claim. § 1125(c); *See Louis Vuitton*, 507 F.3d at 264 (" 'Distinctiveness' in turn refers to the public's recognition that the famous mark identifies a single source of the product using the famous mark."). If there is evidence that the association is likely to harm the reputation of the Marks, there may be a dilution by tarnishment claim. § 1125(c).

Assuming the Rosetta Stone Marks were famous and distinctive since 2004, the Court sees no evidence of dilution by blurring when Rosetta Stone's brand awareness has only increased since Google revised its trademark policy in 2004. The TDRA allows courts to consider the degree of recognition of a famous mark when determining whether that mark's distinctiveness has been impaired. § 1125(c)(2)(B). The Fourth Circuit has also found that no claim for dilution by blurring exists where a defendants' product only increases public identification of the plaintiffs' marks. *Louis Vuitton*, 507 F.3d at 264 (finding no likelihood of dilution by blurring where defendant's "Chewy Vuiton" dog toy parodied plaintiff's marks and caused an increase in plaintiff's brand recognition). Here, Rosetta Stone's brand awareness has only increased since 2004—from 15% in 2005 to 75% in 2009. (Caruso Decl. Ex. 69 at 111:6–12 & 112:1–7, Ex. 30–34, Ex. 60 at 131:6–132:6; Def.'s Mot. Summ. J. 6 & 26–27; Pl.'s Opp'n 24.) Its brand awareness equity also increased from 19% in 2005 to 95% in 2009. (Caruso Decl. Ex. 32, Ex. 69 at 120:21–122:8.) Thus, the distinctiveness of the Rosetta Stone Marks has not been impaired, and Rosetta Stone cannot show that Google's trademark policy likely caused dilution by blurring.

The Court also finds no dilution by tarnishment when there is no evidence that those who purchased the allegedly counterfeit software had a reduced opinion of the Rosetta Stone Marks. (Caruso Decl. Exs. 31–33, Ex. 60 at 131:6–132:6, Ex. 69 at 111:6–17 & 120:21–122:8; Lien Decl. Ex. 1; Spaziano Decl. Tab A at Dubow Dep. 45:1–46:2, Jeffries Dep. 40:11–41:20, Doyle Dep. 25:10–22, Porter Dep. 41:15–42:8, Thomas Dep. 29:19–30:17.) The five individuals who allegedly purchased counterfeit Rosetta Stone products attested to

their positive impression of the brand. (Spaziano Decl. Tab A at Dubow Dep. 45:1–46:2, Jeffries Dep. 40:11–41:20, Porter Dep. 41:15–42:8, Thomas Dep. 29:19–30:17.) Thus, the reputation of the Rosetta Stone Marks has not been impaired, and Rosetta Stone cannot show that Google's trademark policy likely caused dilution by tarnishment. Since Rosetta Stone has not shown that its Marks suffered a loss of distinctiveness or reputation, which it claims resulted from Google's policy of auctioning the Marks as keyword triggers, it is not entitled to judgment as a matter of law.

## IV. CONCLUSION

For these reasons, the Court grants summary judgment in favor of Google on Counts I–VI.

The Clerk is directed to forward a copy of the Memorandum Opinion to counsel.